FRICK CO., INC. *v.* WALTER COX CO., INC. ET AL.

[No. 15,056.   Filed January 30, 1936.]

*B. F. Small* and *Walker, Hilleary & Cox,* for appellant.
*Cox, Conder, Bain & Cox,* for appellee.

DUDINE, J.—This is an appeal from a judgment for defendant, on the pleadings, in a cause instituted by appellant against appellees, the court having sustained the separate and several demurrer of appellees Walter Cox Company, Inc., and Edwin F. New, Receiver of Walter Cox Company, Inc., to the complaint, and appellant having declined to plead further.

The errors relied upon for reversal are alleged errors in sustaining said demurrer to the complaint, as to each of said demurring appellees.

The complaint alleged that appellant was a Pennsylvania corporation engaged in the manufacture of refrigerating machinery and accessories thereto; that appellee Walter Cox Co., Inc., was an Indiana corporation, with its headquarters at Indianapolis; that on the 10th day of October, 1931, said corporations entered into a contract whereby the Cox Company became a distributor for appellant, for certain territory in Indiana; that while said contract was still in effect, the Cox Company ordered certain refrigerating equipment from appellant, for installation in a building of appellee, the Sisters

of Providence. The equipment was sent to the Cox Company at Saint Mary of the Woods, was received by said company, and installation of it was begun, but before the installation was completed and before the Sisters of Providence paid for the equipment, a receiver was duly appointed for the Cox Company.

The complaint asked that appellee receiver be declared a trustee for appellant, and to be holding the indebtedness of the Sisters of Providence for said machinery as such trustee, for appellant, and that he be ordered to turn the same over to appellant.

The demurrer challenged the sufficiency of the facts alleged to constitute a cause of action.

Appellee has challenged the sufficiency of appellant's brief, contending that said brief does not comply with the rules of this court, particularly the rule requiring the assignments of error to "be separately considered by separately numbered propositions concisely stated without argument, supported by separately numbered or lettered points and authorities." Rule 21, Par. 6.

Under "propositions, points and authorities" in appellant's brief said alleged errors are set out as propositions "A" and "B" respectively. Under proposition "B" appellant reiterates (by reference) all points and authorities stated and cited under proposition "A." Under proposition "A" are found one hundred twenty-five (125) "points" numbered consecutively. The "points" are not grouped. Many of them are duplications. Most of them do not show application to the case at bar. Appellant's brief is therefore subject to criticism in that respect, but in view of the result we have reached on the merits of this case, we have concluded not to discuss said contentions.

The contract was incorporated into the complaint. Appellant's contention in this appeal is best stated, we think, in its reply brief, as follows: "The relation

existing between the appellant and the appellee Walter Cox Company, Incorporated, under the contract sued upon is that of principal and factor through the entire course of their dealings, and as to all merchandise involved in this action; that the proceeds of the sales by Walter Cox Company, Incorporated, herein involved, were subject to, and impressed with, a factorage trust in favor of appellant for the factorage indebtedness owing appellant for said merchandise; that that trust is impressed on the funds (and indebtedness) in the hands of appellee receiver in this action, arising from the sale of this merchandise."

So much of said contract as we deem necessary to set out in this opinion is as follows:

### "FACTORAGE CONTRACT

"THIS AGREEMENT made in duplicate by and between Frick Company, a corporation doing business under and by virtue of the laws of PARTIES the State of Pennsylvania, having its principal office at Waynesboro, Pennsylvania, party of the first part, hereinafter called the Company, and Walter Cox Co., Inc., a Corporation doing business under and by virtue of the laws of the State of Indiana, having its principal office at Indianapolis in the State of Indiana, party of the second part, hereinafter called the Factor.

"WITNESSETH: I. This agreement is a Factorage Contract under whose terms the company contracts inter alia to furnish to the Factor for sale within a certain territory Refrigerating and Ice-making Machinery and Apparatus (Ammonia Type) of certain sizes and Ammonia Fittings and Supplies, all of its manufacture, to furnish the Factor a stock of said Machinery on consignment for the same purpose, and to allow the Factor, under certain conditions at the expiration or termination of this Agreement, to return to the Company's factory, or its equivalent, as the Company may direct, any unsold portion of said stock as well as any Fittings purchased hereunder that the Factor may have on hand at that time, at certain stipulated prices;

"AND wherein the Factor contracts inter alia to offer for sale and to sell under certain conditions the articles described herein; to pur-

**FACTORAGE** chase of the Company from time to
**CONTRACT** time as required to fill its orders the articles sold by it; to report sales and deliveries made and to pay the Company certain prices for them; to receive and store in its name as Consignee all Machinery supplied to it for stock; and at the expiration or other termination of this Agreement to return all unsold consigned stock, as well as such Fittings as it may elect, agreeable to the terms more fully set out hereinafter. . . . .

"3. (a) The Company agrees and does hereby allot to the Factor the territory situated within the following boundary: . . .

"4. The Company agrees to furnish the Factor, upon the latter's orders, insofar as it is able to do so with due consideration for its other

**AMMONIA** business and the conditions prevailing
**FITTINGS** at its factory, Ammonia Fittings and
**AND** Supplies of its manufacture such as
**SUPPLIES** commonly are used with Refrigerating Machinery of the type and sizes described in paragraph 3, all F. O. B. cars at Waynesboro, Pennsylvania, or its equivalent.

"The orders for these articles shall be purchase orders as Ammonia Fittings and Supplies will not be carried on consignment by the Company.

"5. From time to time during the life of this contract, the Factor may return to the Company,

f. o. b. cars at Waynesboro, Pennsyl-
**RETURN** vania, or its equivalent as the Company
**OF SLOW** may direct, any new and unused Fit-
**MOVING** tings and supplies purchased hereunder,
**FITTINGS** provided that the articles so returned were clearly standard sizes and types when purchased and subsequently found.in small demand, or to have become unsalable or obsolete through action of the Company; and provided further that the stock in Factor's hands shall be thus cleared of such unsalable or obsolete articles at least once each year; and that the total quantity of such articles which may be returned in any year shall not exceed twenty per cent (20%) of the average stock carried by the Factor during said year. . . .

"6. Upon the termination of this Agreement, when no similar new one is to be made, or the one then existing is not renewed, the RETURN OF LEFT-OVER FITTINGS Factor may return to the Company, f. o. b. cars at Waynesboro, Pennsylvania, or its equivalent as the Company may direct, all of the standard sizes and types of new and unused Ammonia Fittings and Supplies in good condition then unsold and on hand with the Factor, provided they are returned within thirty days after the termination of this Agreement; and for such returned goods, the Company will reimburse the Factor at the net prices current to it on such articles on the date the Agreement expired or terminated.

"7. The Company agrees to furnish to the Factor f. o. b. cars at Waynesboro, Pennsylvania, a stock CONSIGNED STOCK of such machinery as the Company may deem adequate for the Territory involved, and to replenish such stock from time to time in like manner, having due regard for its other business as well as the Factor's ability and preparation to push sales. . . .

"Any such stock remaining in the Factor's care two years from the date of its shipment from the factory shall be returned by the Factor f. o. b. cars Waynesboro, Pa., if and when the Company so instructs.

"8. The Factor agrees to use its best efforts to sell such machinery and fittings within the territory mentioned and energetically to follow up all prospects of sales and push the business in every reasonable way. . . .

"10. The Company agrees to send to the Factor all inquiries received by it from parties residing in INQUIRIES, PROTECTION AND TRADE POLICY said territory for machinery within the range of sizes mentioned herein, and it also agrees to use its best endeavors to prevent and discourage others from offering for sale or selling such machinery within the said territory, but it shall not be liable for any charges, expenses or commissions by reason of the sale of such Machinery within said territory by others, as it cannot guarantee absolute exemption from this possibility.

"The Factor agrees that it will not be interested

directly or indirectly in the sale or distribution of any similar machinery and/or ammonia fittings manufactured or furnished by any person, firm or corporation other than the Company except with the Company's written consent. . . .

"12. The Factor agrees to receive as consignee such machinery as is consigned as stock in his care, to provide a suitable place of business, and storage space for properly caring for the storage and sale of said Machinery in the said Territory, and for properly handling and protecting said stock from injury or loss by the effects of wind, weather, water, fire or theft, and failing to do this to be liable to the Company for any and all injuries or loss it may sustain therefrom or thereby; and he further agrees to deliver, f. o. b. cars at Waynesboro, Pennsylvania, or its equivalent, as the Company may direct, all Machinery belonging to the Company that may be in his care at the termination of this agreement, unless this agreement is renewed, or a new Agreement made whereby the possession of the stock is otherwise provided for.

STORAGE AND CARE OF STOCK

"The Factor agrees that all Machinery to be returned but not so returned at the termination of this agreement shall be subject to the will of the Company and further agrees that on written demand of the Company, it will pay cash for all such machinery.

"13. The Factor agrees to make all sales of said Machinery and Fittings to buyers throughout the said territory, in its own name, for its own accounts, and at its own expense, and the Company agrees that when making such sales the Factor may include, without prejudice to any of the terms of this Agreement, with the said Machinery such other machinery and apparatus not manufactured by the Company but corelated or auxiliary to it as may be required to make a complete operating plant, the intention being to enable the Factor to enter into contracts for the sale of complete Refrigerating or ice-making plants of the sizes hereinbefore stated when it so desires.

FACTORAGE SALES

ALLIED MACHINERY

"14. The Factor agrees to submit to the Company its purchase order in duplicate on forms pro-

vided by the Company for each sale of
ORDERS Machinery on the day such sale is made,
and shall indicate thereon when and to
whom delivery is to be made, and whether it will
be made from stock on consignment or from the
Company's factory at Waynesboro, Pennsylvania.

"The Factor agrees to deliver from stock only
the Machinery for which the Company has accepted
its orders; and it is mutually under-
DELIVERY stood that acceptance of an order by the
Company will be the Factor's authority
to make delivery thereof from stock at any time
within sixty (60) days after such acceptance. All
machinery not removed within this period will at
the option of the Company revert to the consigned
stock, and the order therefore will become void and
cancelled; but the Company shall give notice of the
voidance or cancellation of any order under the
provision.

"The Factor agrees to issue to the Company
transfer in duplicate on forms provided by the
Company for all Machinery delivered
TRANSFERS to its trade; a separate transfer for
each delivery; for Machinery removed
from stock the transfer shall be made on the day
of actual removal; for Machinery shipped from
factory direct to the user the transfers shall be
made on receipt of invoice for it and the transfer
shall bear even date with the invoice.

"The Factor agrees to make monthly settlements
of its accounts as follows:

"*Settlement for Machinery* purchased hereunder
will be due on the 10th day of the second month next
following actual date of shipment from factory, or
removal from consigned stock, and the Factor agrees
to remit in cash in full promptly on that date;
*settlement for Fittings and Supplies* purchased here-
under will be due on the 10th day of the second
month next following date of their shipment; one-
half ($\frac{1}{2}$) of the account of each settlement will be
due in cash, and one-half ($\frac{1}{2}$) may be covered by a
six-month note bearing interest at the rate of six
per cent per annum from date until paid; Settle-
ments for Shortages in consigned stock, if any occur,
will be due and demandable immediately upon their
discovery or determination.

"Should the Factor fail to make settlement in

accordance with the above provisions, the Company may, at its option, terminate this agreement upon five days' written notice without regard to the other stipulations of this contract.

"It is understood and agreed that from time to time a physical inventory of stock on consignment with the Factor will be taken, and any Machinery or parts found to be short or over at such time will be in order for immediate settlement at the net prevailing prices at the time. . . .

"17. The Factor agrees that all consigned stock on hand unsold shall at all times be subject to the order of the Company, to removal for STORAGE the Company's account upon its orders, without any charge for insurance, taxes, storage, or handling during the time that it may have been in the care and custody of the Factor; to store on the same conditions and properly care for all machines on hand at the expiration or other termination of this Agreement free of charge for a period of ninety (90) days unless sold or otherwise disposed of by Frick Company within this time; and to loan and ship the same at the Company's direction without charge for so doing, at any time within that period requested by it to do so; but the Company agrees to refund to the Factor the freight paid by it on all such items which the Company orders withdrawn for its account and use prior to the expiration or termination of this Agreement and on such items will also pay the Factor a warehousing charge of five per cent (5%) of the net current price of such stock on the date of its removal. . . .

"The Factor agrees to keep the Machinery and Apparatus herein contracted for insured continuously against loss from fire, wind INSURANCE and water, in solvent insurance companies legally authorized to do business in the State in which the goods may be located and failing to provide such insurance, the Company may provide the same and add the cost thereof to the price of the goods; or in the event the goods are not insured by either party, the Factor agrees to be and remain fully responsible for any loss that may occur from the causes recited in this paragraph.

"18. The Factor agrees that all Machinery re-

ceived by it under this Agreement shall continue to be the sole property of the Company until TITLE fully paid for in cash, and that the title to the same shall be and remain in the Company until it is fully paid for, regardless of whether the said Machinery is found in the Factor's stock and possession, or in the hands of someone else.

"19. The Factor agrees to do all things necessary to protect the Company and the con- CREDITORS' signed stock from claims or confisca- CLAIMS tion by others, regardless of whether the claims they have against it are valid or not.

"21. The Company agrees to furnish, free of charge, f. o. b. its factory, Waynesboro, Pennsyl- vania, a duplicate part or parts to WARRANTY replace any part or parts of any of the said Machinery furnished under this Agreement that proved defective in workman- ship or material within one year from date of ship- ment, provided said defective part or parts have first been received by the Company at Waynesboro, Pennsylvania, transportation charges prepaid, for inspection, and it appears that said defects existed at the time shipment was made and it is further mutually agreed that the Company in no event is to be liable for loss, damage or delays caused by such defective parts, the Company's entire liability being expressly limited to the furnishing of said duplicate parts, and the Factor agrees that he will not sell such Machinery under any other guar- antee. . . ."

In construing this contract we must keep in mind the principle of law that requires us to construe it as a whole. We must, if it can be reasonably done, ▆▆▆ construe the contract so as to make it conform with the judgment rendered by the trial court. The judgment should not be reversed unless appellant has shown by its brief—*not* that the contract is more reasonably subject to a construction which is inconsis- tent with the judgment, but that the contract is *not*

reasonably subject to *any* construction which is consistent with the judgment.

Appellant in many of its "points" refers to the many places in the contract where the words "factor" and "factorage" are used, and contends that such use of said words indicates that a relation of factor and principal was intended as to all their dealings. The use of the words "factor," "factorage," etc., serves to express the *opinion of the parties* as to the type of relationship which they were providing for in the contract. We are not bound by such opinion.

As was said in *Warrum et al.* v. *White* (1909), 171 Ind. 574, 577, 86 N. E. 959: "The leading purpose in the construction of contracts is to ascertain the intent of the parties. . . . The intent is to be determined from the whole contract, and every clause, and even every word therein, where possible, should have assigned to it some meaning. While the words are to be taken in their ordinary and popular sense, they will not be so construed if the intention of the parties, as manifested by the contract, shows that they are used in a different sense."

The transactions between appellant and the Cox Company involved here, if considered separate and apart from the contract, constituted sales. The contract, when considered as a whole, does not show an agreement between appellant and the Cox Company that such transactions would be considered anything else than what they are in legal effect. Therefore we hold that the relation of factor and principal did not exist between said parties, as to the transactions involved herein; that on the contrary said transactions were sales; that title to the refrigerating equipment passed to the Cox Company; that title to the proceeds of the sale thereof to the Sisters of Providence passed to the Cox Company, and that said proceeds are

not impressed with a trust, in favor of appellant, on account of the failure of the Cox Company, to pay appellant therefor. See *The Aetna Powder Co.* v. *Hildebrand et al.* (1894), 137 Ind. 462, 37 N. E. 136.

Appellant places much reliance upon paragraph eighteen of the contract (see *Supra*) which provides that title to the machinery shall remain in appellant until it is paid for. Said paragraph is inconsistent with the contract as a whole, insofar as the contract applies to transactions similar to those involved here.

In paragraph thirteen the Cox Company agreed "to make all sales of machinery and fittings to buyers . . . *for its own accounts.*" Paragraph fourteen provides for "settlements" between appellant and the Cox Company. The settlements provided are not dependent in any way upon the settlements made between the Cox Company and its customers. Since the Cox Company assumed the responsibility of selling the merchandise *"on its own account,"* and of making settlements therefor with appellant, regardless of whether or not Cox Company's customers paid the Cox Company, the lower court was justified in finding that, in transactions between appellant and the Cox Company, similar to these involved here, title passed to the Cox Company.

Furthermore the provisions of paragraph eighteen indicate an intention upon the part of the parties to make all transactions between them conditional sales. Such provisions can not apply in cases like the one before us, where appellant, the vendor, sells merchandise upon credit and grants to the vendee the right to sell the same at retail. *West* v. *Fulling* (1905), 36 Ind. App. 617, 76 N. E. 325.

Finding no reversible error, the judgment is affirmed.